1  CHRISTOPHER COOKE, CA Bar #142342
   STEPHEN S. WU, CA Bar # 205091
2  COOKE KOBRICK & WU LLP
   177 Bovet Road, Suite 600
3  San Mateo, CA 94402
   Email: ccooke@ckwlaw.com
4          swu@ckwlaw.com
   Tel: (650) 638-2370
5  Fax: (650) 341-1395
   Attorneys for Plaintiffs
6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  MEI-FANG LISA ZHANG, BAY AREA      ) Case No.:
    AFFORDABLE HOUSING, LLC, XUE-      )
13  HUAN GAO, YANG-CHUN ZHANG,         ) **COMPLAINT**
    CAROL JIAN DENG, and HAO LIANG,    )
14                                     ) **REQUEST FOR JURY TRIAL**
                                       )
15            Plaintiffs,              )
                                       )
16     vs.                             )
                                       )
17  WEI-MAN RAYMOND TSE, RUN PING      )
    ZHOU a.k.a. FLORA ZHOU, THERESA    )
18  WONG, JAMES YU, BILL SHU WAI MA,   )
    MOLLY LAU, VICTOR SO, JIAN XIAO,   )
19  CHRIST INVESTMENT SERVICE INC., CIS)
    SERVICE, INC., PACIFIC BEST GROUP  )
20  LTD. a.k.a. PACIFIC BEST COMPANY   )
    LTD., and SOUTH CHINA INVESTMENT   )
21  INC.,                              )
              Defendants.              )
22                                     )
    _____)
23

24

25       For their Complaint, Plaintiffs allege as follows:

26              I.    **SUMMARY OF THE ACTION**

27       1.      This is an action, both in law and in equity, brought by victims of commodities

28  fraud under the Racketeer Influenced Corrupt Organization Act ("RICO") and the Commodity

1  Exchange Act ("CEA").  Plaintiffs seek monetary damages, punitive damages, and injunctive

2  relief.

3      2.    Plaintiffs are individuals and a small business in the San Francisco Area and in

4  particular are members of the San Francisco Chinese community.  Defendants are individuals

5  and the businesses they operated in San Francisco, which purported to conduct foreign currency

6  futures trading on behalf of clients for investment purposes.  Plaintiffs invested large sums of

7  money with Defendants for foreign currency futures trading in response to personal solicitations

8  and advertisements in Chinese language newspapers.

9      3.    Defendants' businesses, however, were wholly fraudulent.  Defendants opened an

10  office, used telephone trading telephone lines in Hong Kong, created computerized records,

11  faxed and emailed written reports of accounts to customers, provided receipts for funds received,

12  and in some cases returned modest amounts of investor moneys, all for the purpose of creating

13  the appearance of a legitimate foreign currency futures trading business.  Defendants, however,

14  never actually conducted any foreign currency futures trading, and simply stole the funds that

15  investors transferred to them for their personal use.

16      4.    Despite the fact of enforcement actions and permanent injunctions barring some

17  of the Defendants from engaging in the sale of illegal off-exchange futures contracts in foreign

18  currencies and commodities fraud, Defendants have continued their illegal conduct and, upon

19  information and belief, will continue such conduct unless enjoined by this Court.

20              **II.    JURISDICTION AND VENUE**

21      5.    This action arises under the laws of the United States, and in particular, RICO, 18

22  U.S.C. § 1961 et seq., the CEA, 7 U.S.C. §§ 1 et seq.  Accordingly, this Court has jurisdiction

23  over the subject matter of this action pursuant to 28 U.S.C. § 1331, 7 U.S.C. § 25(c), and 18

24  U.S.C. § 1964.

25      6.    This Court has supplemental jurisdiction over the state law claims pursuant to 28

26  U.S.C. § 1367(a), because these claims are so related to the federal claims in this action that they

27  form part of the same case or controversy.

28

7.    Venue is proper in this district under 18 U.S.C. § 1965(a), 7 U.S.C. § 25(c), and 28 U.S.C. §§ 1391(b) and (c) because the Defendants reside, can be found, and/or transact their business and affairs in this district; the corporate Defendants' principal places of business are located in this district; the corporate Defendants are subject to personal jurisdiction in this district; and a substantial part of the events or omissions giving rise to the claim, including without limitation the acts or transactions constituting CEA violations, occurred in this district.

### III.    INTRADISTRICT ASSIGNMENT

8.    This case should be assigned to the San Francisco Division of this Court because a substantial part of the events and omissions which give rise to the claim occurred in San Francisco County.  See Local Rule 3-2(c) and (d).

### IV.    PARTIES

9.    At all times relevant to this Complaint:

a.    Plaintiff Mei-Fang Lisa Zhang has been a resident of Millbrae, San Mateo County, California.

b.    Plaintiff Bay Area Affordable Housing, LLC is a California limited liability company, whose principal executive office is in San Francisco, California.

c.    Plaintiff Xue-Huan Gao has been a resident of San Francisco, California.

d.    Plaintiff Yang-Chun Zhang has been a resident of Millbrae, San Mateo County, California.

e.    Plaintiff Carol Jian Deng has been a resident of San Francisco, California.

f.    Plaintiff Hao Liang has been a resident of San Francisco, California.

10.    Upon information and belief, Defendant Wei-Man Raymond Tse is an individual who resides in San Mateo County, California.  He has never been registered with the CFTC or the State of California in any capacity.

11.    Upon information and belief, Defendant Run Ping Zhou, a.k.a. Flora Zhou, is an individual who resides in the Northern District of California.  She has never been registered with the CFTC or the State of California in any capacity.  Upon information and belief, Run Ping Zhou was a manager and owner of Defendant South China Investment Inc.

12.     Upon information and belief, Defendant Theresa Wong, is an individual who resides in San Mateo County, California.  She has never been registered with the CFTC or the State of California in any capacity.  Upon information and belief, Wong is Tse's wife.

13.     Upon information and belief, Defendant James Yu, is an individual who resides in the Northern District of California.  He has never been registered with the CFTC or the State of California in any capacity.

14.     Upon information and belief, Defendant Bill Shu Wai Ma, is an individual who resides in San Francisco, California.  He has never been registered with the CFTC or the State of California in any capacity.  Upon information and belief, Bill Ma was a principal and/or owner of Defendants Christ Investment Service Inc. and CIS Service Inc., as well as CIS International LLC.

15.     Upon information and belief, Defendant Molly Lau, is an individual who resides in San Francisco, California.  She has never been registered with the CFTC or the State of California in any capacity.

16.     Upon information and belief, Defendant Victor So, is an individual who resides in Santa Clara County, California.  He has never been registered with the CFTC or the State of California in any capacity.

17.     Upon information and belief, Defendant Jian Xiao, is an individual who resides in the Northern District of California.  He has never been registered with the CFTC or the State of California in any capacity.

18.     Upon information and belief, Defendant Christ Investment Service Inc. ("CIS Inc.") is a California corporation with its principal executive office at 900 Kearny Street #228, San Francisco, California 94133.  Although CIS Inc. submitted an application to become a registered introducing broker with the CFTC, the application name was changed to Christ Investment Service, LLC.  CIS Inc. never became a registered introducing broker or member of the National Futures Association.  CIS Inc. has never been registered with the State of California in any capacity.

19.     Upon information and belief, Defendant Pacific Best Group, Ltd., a.k.a. Pacific Best Company Ltd. ("Pacific Best") is organized as a British Virgin Islands Company, and has offices at 900 Kearny Street #228, San Francisco, California 94133.  Pacific Best has never been registered with the CFTC or the State of California in any capacity.

20.     Upon information and belief, Defendant South China Investment Inc. ("South China") is a defunct California corporation, and had an office at 300 Montgomery Street, Suite 730, San Francisco, California 94104.  South China has never been registered with the CFTC or the State of California in any capacity.

21.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each Defendant was an agent, servant, franchisee, joint venturer, partner, employee, and/or co-conspirator of the other Defendants herein named, and at all said times, each of said Defendants was acting within the course and scope of said agency, service, franchise, joint venture, partnership, employment, and/or conspiracy.

## V.    GENERAL FACTUAL ALLEGATIONS

### A.    Background and Enforcement Action Against Run Ping Zhou

22.     The Defendants' conduct herein is an example of a foreign currency trading scam. According to a 2003 article by Daniel A. Nathan, Chief of the Office of Cooperative Enforcement, Division of Enforcement, Commodity Futures Trading Commission ("CFTC"):

> Recent years have seen a sharp rise in the incidence of foreign currency trading scams.  Much foreign currency trading is legitimate and futures and options on foreign currencies, whose value typically is based on the exchange rate between the relevant foreign currency and the dollar, trade on the Chicago Mercantile Exchange.  However, various forms of foreign currency trading have been promoted in recent years to defraud members of the public.  Promoters often attract customers through ads in newspapers, radio or cable television promotions, attractive Internet sites, and cold calling.  As with the other forms of commodities fraud, these ads might claim high returns and limited risks from these investments, boast a profitable trading history, and purport to have extensive experience and expertise in this sophisticated area. . . .  Finally, many [foreign currency] forex shops offer employment to members of the retail public as traders in foreign currency.  Those who take up the offer often end up being fleeced while becoming unwitting participants in the fleecing of others:

Daniel A. Nathan, The Commodity Future Trading Commission's (CFTC) Assault on Fraud, United States Attorneys' Bulletin, Nov. 2003, at 14.

23.    In March 2000, the California Department of Corporations announced an enforcement action "crackdown" against 24 entities and 74 individuals for illegal and fraudulent conduct in connection with the offer and sale of foreign currency investments.  In one of those actions, <u>The People of the State of California v. Y&T, Inc. dba Tokyo International Investment, Ltd.</u>, No. 310-839, Superior Court of California, County of San Francisco (the "Tokyo International Case"), one of the defendants was Defendant Run Ping Zhou herein.

24.    In December 2000, Zhou settled with the State, and signed a Stipulation and Agreement for the entry of a Judgment of Permanent Injunction against Zhou (the "Zhou Injunction").  A true and correct copy of the Zhou Injunction is attached hereto as Exhibit A.  The Zhou Injunction prohibited Zhou from, among other things, selling or offering any commodity contract in violation of California Corporations Code Section 29520 and making fraudulent statements in violation of California Corporations Code Section 29536.

**B.    Tse and His Currency Trading Companies**

25.    Wei-Man Raymond Tse is the mastermind and organizer of a series of businesses and a group of individuals with the same purpose:  to entice unwitting individuals to invest money with what appear to be legitimate companies selling foreign currency futures contracts and to steal their money.  The other individual Defendants, Run Ping Zhou, Theresa Wong, James Yu, Bill Shu Wai Ma, Molly Lau, Victor So, and Jian Xiao acted as Tse's lieutenants, and managed the businesses and various business entities controlled by Tse, including the business entity Defendants herein.  Upon information and belief:

a.    Until recently, Theresa Wong acted as treasurer and handled all of the money for the various businesses controlled by Tse.

b.    James Yu, Victor So, and Jian Xiao are partial owners of one or more of the businesses controlled by Tse.

c.    Bill Shu Wai Ma, and Victor So, and Jian Xiao are involved in the day-to-day operations with the businesses.

d.    Molly Lau handles all of the training of new recruits that Defendants train to become account executives.

26.     When legal troubles would beset one company, Tse would simply create a new one and continue to conduct the same fraudulent business under the new name.

27.     South China was incorporated as a California corporation on November 9, 2000, during the pendency of the Tokyo International Case.   South China conducted the foreign currency trading fraud described herein in its offices at 300 Montgomery Street, Suite 730, in the City and County of San Francisco, California.

28.     Pacific Best transacted business through South China in San Francisco.   South China introduced customers to Pacific Best for the purpose of trading in foreign currency.

29.     South China ceased operations in or around February 2004.

30.     National Investment Consultants, Inc. ("NICI") was incorporated as a California corporation on February 2, 2004, and continued the foreign currency trading fraud described herein in its offices at 300 Montgomery Street, Suite 660, in the City and County of San Francisco, California.

31.     Pacific Best, along with South China and later NICI, established offices in San Francisco's financial district.   They furnished the offices, established computer systems, and obtained telephone lines and systems, all with the goal of creating the appearance of legitimate offices of an investment company conducting foreign currency trading.

32.     South China, Pacific Best, and later NICI placed ads in the "Employment/Job Opportunity" classified section of the Chinese language newspaper Sing Tao Daily in San Francisco, California.   The ads in Sing Tao Daily offered employment and job opportunities with promises of health insurance, good pay, and a professional work environment to persons who speak the Mandarin or Cantonese dialects of Chinese.   The purpose of advertisements was to recruit employees who would solicit customers and who would invest their own money in Defendants' purported currency trading.

33.     During and after the hiring process, Defendants promised to train the new employees to trade foreign currency.   Each new employee was given an information sheet with the employee's name, account, PIN, and telephone number in Hong Kong.   Defendants

1  instructed the employees to place "trades" by calling the number of the information sheet.

2  Employees' calls to these trading lines were recorded and the recordings were retained.

3      34.    Defendants encouraged employees to invest their own funds in alleged currency

4  trading. Thus, employees were both employees and customers of Defendants. Defendants also

5  instructed their employees to solicit family members, relatives, and friends to invest. Through

6  this hiring and network, Defendants obtained funds from hundreds of individuals in the San

7  Francisco Chinese community.

8      35.    When an individual invested funds with a Defendant company, the company

9  would provide a deposit receipt showing the amount received.

10      36.    The Defendant corporations provided investors with frequent statements showing

11  the amounts they invested, the purchase or sales transactions of currency futures, the currencies

12  held in their accounts, and their profits and losses from trades. Defendants sent these statements

13  to investors via email or facsimile.

14  **C.    Defendants Operated Outside Governmental Regulation**

15      37.    Defendants have and continue to offer foreign currency futures contracts to

16  members of the retail public. Despite taking money from investors, none of the Defendants has

17  ever registered with the CFTC as a futures commission merchant.

18      38.    Defendants do not conduct their foreign currency futures transactions on or

19  subject to the rules of a board of trade that has been designated by the CFTC as a contract

20  market, nor have they executed or consummated any of their foreign currency futures

21  transactions by or through a member of such a contract market. Defendants do not conduct their

22  transactions on a facility registered as a derivatives transaction execution facility.

23      39.    Most, if not all, of the Defendants' customers are retail customers under the CEA.

24  That is, they have a net worth of less than $5 million and therefore do not constitute "eligible

25  contract participants" whose transactions do not fall under CFTC jurisdiction under the CEA. 7

26  U.S.C. § 2(c)(2)(B)(i) and (ii).

27      40.    Transactions by Defendants have not been with regulated entities that are proper

28  counterparties to foreign currency transactions with retail customers under 7 U.S.C.

§ 2(c)(2)(B)(ii)(I)-(VI).    Defendants do not qualify as appropriate counterparties under this section of the CEA.

**D.    Fraudulent Conduct by Defendants**

41.    Defendants represented to potential investors that they had considerable experience in foreign currency futures trading when, in fact, most alleged trades were placed by superficially-trained account executives hired via the newspaper employment ads described above.

42.    Defendants told Plaintiffs that profits from their investment would be tax-free.

43.    Tse and other individual Defendants showed potential investors statements of what purported to be their personal accounts, which appeared to show that they invested relatively modest amounts in foreign currencies, but had made large profits.  These statements were false.

44.    Upon information and belief, the account statements sent to investors were not based on any real data, but instead reflected non-existent transactions in order to create the false appearance that real trades in foreign currency futures were occurring.

45.    Upon information and belief, Defendants worked with confederates in Hong Kong to establish trading lines and record the fraudulent transactions to create an appearance of legitimate records and trading activity in foreign currency futures when, in fact, no actual trading took place.

46.    Defendants typically caused new investors to receive statements showing healthy paper profits at first, in order to encourage investors to invest even more.  Later, however, once Defendants obtained all they could from investors, the Defendants caused the statements to show losses, which Defendants attributed to market losses.  Defendants used these statements showing alleged market losses in order to cover up their theft of their investors' funds.

47.    Occasionally, investors sought to cash out their investments and obtain their money back.  If investors sought relatively modest sums back, Defendants may have returned those funds to continue the appearance of the investors having legitimate accounts with funds remaining.  If an investor sought to cash out large amounts, or his or her whole investment,

1  however, Defendants would attempt to put off the investor and delay any payout, or state that

2  they did not have actual possession of the investor's funds and that the investor's funds were

3  with a Hong Kong bank. These statements were false and Defendants used these excuses to keep

4  investors' money.

5          48.    In seeking investments from their employees and non-employee investors,

6  Defendants made material misrepresentations and/or omissions. In specific, they:

7          a.    Represented that investors in their companies gained large profits and had good

8          prospects for future profits when, in fact, they did not.

9          b.    Represented that engaging in foreign currency futures transactions with

10          Defendants would be a "guaranteed win" as long as investors didn't need to close

11          their account in the short run.

12          c.    Failed to disclose the risks of loss from foreign currency trading.

13          d.    Failed to disclose the lack of experience of account executives placing the alleged

14          trades.

15          e.    Misrepresented that profits from investments in foreign currency would be tax-

16          free.

17          f.    Failed to disclose the fact that they were not futures commission merchants

18          registered with the CFTC and that they had no authorization to take investors'

19          money.

20          g.    Failed to disclose the Tokyo International Case against Zhou or the Zhou

21          Injunction.

22          h.    Failed to disclose the fact that the individual Defendants were actually keeping

23          the money invested by investors.

24          i.    Issued false statements showing fictional trades, showing non-existent losses from

25          those trades, and failing to disclose Defendants' misappropriation of money from

26          investors' accounts.

27          49.    The Defendants' statements and omissions led Plaintiffs to believe Defendants

28  were operating a legitimate business in foreign currency futures trading with a promising

1   opportunity for profits.  In reliance upon these statements, Plaintiffs invested considerable sums

2   of money with Defendants.

3       50.    Plaintiffs' reliance upon Defendants' statements and omissions was justifiable and

4   reasonable.  When they invested money with Defendants, Plaintiffs had no evidence that

5   Defendants were stealing their money.  Moreover, Defendants showed Plaintiffs what appeared

6   to be legitimate documentation showing that individual Defendants had profited handsomely

7   from foreign currency futures trading.  Defendants operated an office with all of the trappings of

8   a legitimate business.  Trades were actually recorded by phone calls made to Hong Kong.

9   Finally, the Defendants had an elaborate computer system that created what looked to be

10  accurate statements of trading activity.

11      51.    Upon information and belief, Defendants have stolen the money invested by

12  Plaintiffs.  Thus, Defendants' statements and omissions caused Plaintiffs to sustain damages as

13  described in more detail below.

14  **E.    Enforcement Action Brought by the CFTC and the State of California**

15      52.    Following an investigation of Pacific Best, NICI, and South China, the

16  Commodities Futures Trading Commission sought to halt what the CFTC claimed were material

17  misrepresentations and/or omissions concerning the profitability of foreign currency trading, the

18  risk of loss involved in foreign currency trading, the experience of their account executives,

19  and/or the existence of litigation involving Run Ping Zhou (a.k.a. Flora Zhou).

20      53.    On June 28, 2005, the CFTC and the Commissioner of Corporations for the State

21  of California ("State of California") filed a Complaint for permanent injunction and other relief

22  against Pacific Best, NICI, South China, Tse, and other principals of the foregoing businesses.

23  U.S. Commodities Future Trading Commission et al. v. National Investment Consultants, Inc., et

24  al., No. 05-CV-02641 JSW (N.D. Cal. filed Jun. 28, 2005) (the "CFTC Action").  The CFTC and

25  State of California alleged violations of the CEA, regulations promulgated under CEA, and

26  California Corporations Code §§ 29520, 29536.  They also alleged that Pacific Best, South

27  China, and NICI dealt in futures when the transactions have not been conducted on, or subject to

28  the rules of, a registered board of trade in violation of the CEA and California Corporations Code

§ 29520. The CFTC and State of California sought a statutory order and preliminary injunction freezing the assets of the defendants therein.

54. On June 29, 2005, a statutory restraining order was entered as to all defendants therein. On August 26, 2005, the Court granted in part and denied in part a motion for preliminary injunction enjoining Pacific Best, NICI, South China, and Zhou from violations of the CEA and the California Corporations Code.

55. The CFTC and State of California ultimately settled with the defendants therein, and these defendants consented to the entry of a Consent Order of Permanent Injunction and Other Equitable Relief Against Defendants Pacific Best Group Ltd., National Investment Consultants, Inc., Wei Man Tse, Run Ping Zhou, Yi Kerry Xu, and Relief Defendant Theresa Wong ("Consent Order"). The Court entered the Consent Order on September 1, 2006. A true and correct copy of the Consent Order is attached hereto as Exhibit B.

56. The Consent Order enjoined the defendants therein from the violations of the CEA, regulations promulgated thereunder, and the California Corporations Code alleged in the CFTC Action. (Consent Order at 10-12.) The Consent Order bound the defendants therein; any officer, agent, servant, employee, or attorney of such defendants, and any person receiving actual notice of the Consent Order to the extent he or she is acting in active concert of participation with the defendants therein. (Id. ¶ 5, at 12-13.) The Consent Order also called for the payment of civil money penalties to the CFTC and State of California. (Id. ¶ 7-9, at 14-15.)

57. The Consent Order also required the defendants in the CFTC Action to make restitution to customers in the following amounts:

| | |
|---|---|
| Raymond Tse: | $150,000 |
| Flora Zhou: | $150,000 |
| Yi Kerry Xu: | $ 20,000 |

In addition, Theresa Wong was ordered to disgorge $18,500 of ill-gotten gains. (Consent Order ¶ 6, at 13.)

58. The Consent Order called for a monitor, Daniel Driscoll of the National Futures Association (the "Monitor"), to collect the restitution payments and pay customers pursuant to a

distribution plan approved by the Court.  The Consent Order called for the transfer of assets frozen by the Court to the Monitor as defendants' first payment towards restitution owed under the Consent Order.  (Id. ¶ 10, at 15; id. ¶ 13(a), at 16-17.)

59.   The Consent Order called for the defendants in the CFTC Action to make additional payments of restitution and penalties over time.  (Id. ¶ 13(b)-(c), at 17.)  If these defendants fail to make the payments called for in the Consent Order, and if they fail to cure the deficiency within 10 days following notice to them, a stipulated judgment is to be entered into by which the defendants are liable for an additional $1,200,000 as additional restitution or civil money penalties.  (Id. ¶ 13(d), at 17-18.)

60.   Under the Consent Order, the Court retains jurisdiction of the CFTC Action to implement and carry out the terms of the Consent Order and other orders, and to grant additional relief to assure compliance with the Consent Order.  (Id. ¶ 3, at 20.)

61.   After the CFTC filed the CFTC Action, the individual Defendants created yet more business entities to conduct their fraudulent scheme under new corporate names.  On August 12, 2005, Defendants incorporated Christ Investment Service Inc. ("CIS Inc.").  On February 24, 2006, Defendants organized Christ Investment Service, LLC ("CIS") as a Nevada limited liability company.  On May 23, 2006, Defendants incorporated CIS Service Inc. ("CIS Service").  Upon information and belief, Defendants are using CIS Inc., CIS, CIS Service, and other entities to circumvent the injunctions in the Consent Order and the Zhou Injunction.

F.   **Member Responsibility Action Brought by the NFA**

62.   In April 2006, CIS became a registered introducing broker and a member of the National Futures Association.  As an introducing broker ("IB"), but not a futures commission merchant ("FCM"), CIS was barred from receiving investor money.

63.   In March 2007, a customer tipped off the National Futures Association that she had a trading account with CIS, and that she had given money to CIS.  A representative of NFA began an investigation of CIS and visited its offices on April 2, 2007 to interview people there.  After the visit, NFA conducted additional interviews.

64.    The NFA found that CIS is illegally acting as an FCM by accepting funds, and provided false and misleading information to NFA during the investigation.

65.    On April 6, 2007, the NFA took a Member Responsibility Action ("MRA"), in which it suspended CIS' NFA membership, prohibited CIS from acting in any manner requiring registration under the CEA, prohibited CIS from soliciting or accepting additional customer accounts, prohibited CIS from accepting or placing trades (except to liquidate existing positions), prohibited CIS from distributing, disbursing, or transferring any funds without NFA approval, and required CIS to provide copies of the MRA to investors from whom CIS received monies. A true and correct copy of the MRA is attached hereto as Exhibit C.

## G.    Continuing Fraudulent Conduct of Defendants

66.    Upon information and belief, the individual Defendants used, and are continuing to use, CIS Inc., CIS, CIS Service, and other entities to conduct the same fraudulent scheme to take investors' money by purporting to conduct foreign currency trading as that described herein. Defendants are continuing to take funds from investors and keep such funds.

67.    Through CIS Inc., CIS, CIS Service, and other entities, the individual Defendants continued, and presently are continuing, to steal investors' money and make the misrepresentations described in Section 48 above.  In addition, upon information and belief, Defendants:

a.    Are failing to disclose the Consent Order and its findings of fact regarding the Defendants' illegal conduct.

b.    Are failing to disclose the NFA MRA and its findings of fact regarding the illegal conduct of CIS and individual Defendants set forth in the MRA.

68.    Through CIS Inc., CIS, CIS Service, and other entities, Defendants are continuing to deal in illegal off-exchange futures contracts outside of governmental regulatory oversight in violation of the CEA and California Corporations Code § 29520.

69.    Upon information and belief, CIS, CIS Service, and the other Defendants will continue to take investors money, and make material misrepresentations and/or omissions to potential and existing investor customers unless enjoined by the Court.

**H.    Use of Wire and Bank Fraud**

70.    Defendants committed numerous acts of wire fraud as part of their scheme to defraud investors of money.  Predicate acts include, but are not limited to, the following:

a.    From November 2000 to the present, Defendants caused their account executives to place all phony foreign currency trades by having such agents use the telephone to dial a number in Hong Kong and record such trades.  Therefore, Defendants made countless daily uses of the telephone to advance their scheme to defraud investors of money.

b.    From November 2000 to the present, Defendants sent Plaintiffs and other investors countless false statements of purported daily trading activity and account balances, often every business day, all by email or fax.

c.    In August 2006, Defendant Theresa Wong talked on the telephone with Xue-Huan Gao, who had called in response to an employment ad placed in the Sing Tao Daily Newspaper.  Wong talked about the job offered and invited Gao to come to Defendants' office to interview for the job.  In that same month, an unknown representative working for one of the Defendant businesses talked on the phone with Carol Jian Deng.  Deng had also called in response to an employment ad in the Sing Tao Daily Newspaper.  The representative invited Deng to come to Defendants' office to interview.  Wong and the unknown representative, both acting on behalf of Defendants, intended these calls to lure Gao and Deng into becoming account executives and soliciting customers to invest with Defendants, and to steal money from these customers and from Gao and Deng themselves.

71.    Defendants committed numerous acts of bank fraud as part of their scheme to defraud investors of money.  Investors wrote checks to the Defendant corporations and other businesses controlled by the Individual Defendants.  In this way, Defendants fraudulently obtained funds under the custody and control of a bank, namely funds that had previously been in investors' accounts.  Predicate acts include, but not limited to, the following:

a.    Check drawn by Hao Liang on his checking account at Bank of America on September 20, 2006 in the amount of $10,000, and paid to "Christ Investment Service."

b.    Bank of America cashier's check drawn by Hao Liang on September 21, 2006 in the amount of $6,000, and paid to "Christ Investment Service."

c.    Check drawn by Hao Liang on his checking account at Washington Mutual Bank on September 21, 2006, in the amount of $4,000, and paid to "Christ Investment Service."

d.    Bank of the Orient cashier's check drawn by Carol Jian Deng on December 4, 2006 in the amount of $20,000, and paid to "Christ Investment Service."

## I.    Investments and Losses of the Plaintiffs

72.    Defendants or their agents or employees solicited the Plaintiffs to invest their money in foreign currencies.  Defendants made the statements and omissions described above in paragraphs 48 and 67.

73.    In reliance upon Defendants' representations, Plaintiffs placed their trust and confidence in Defendants, invested large sums of money with the corporate Defendants, and became their customers.   Plaintiffs trusted Defendants to make actual foreign currency transactions on their behalf, and Defendants orally agreed to use their funds to conduct such transactions.

74.    In fact, the Defendants have taken Plaintiffs' funds without conducting any actual foreign currency transactions, and have misappropriated Plaintiffs' funds for their personal use. As a result, Plaintiffs have lost their money.

## 1.    Allegations Specific to Mei-Fang Lisa Zhang

75.    In mid-2003, Mei-Fang Lisa Zhang responded to an employment advertisement placed by Defendants in the Sing Tao Daily newspaper.  The advertisement offered a clerk job and said that no experience was necessary.  The advertisement said the company offered a professional work environment and training.  Zhang was interviewed for the job and was hired to work for NICI, Pacific Best, and South China.  The entities paying Zhang for her work also included CIS Inc. and CIS Service.

76.    Immediately after being hired, Zhang attended training classes taught by Defendant Raymond Tse.  The training was ostensibly for the purpose of teaching Zhang and

other trainees how to place foreign currency futures trades. During the training, Tse said that Zhang and the other trainees would become account executives and would be compensated by placing foreign currency futures trades on behalf of customers or themselves. They would receive a flat amount per "lot" of $2,000 invested, and they would receive a base salary if they placed more than 20 lots in a month. Tse said that the trainees would not be provided their own customers. Thus, they encouraged Zhang and the other trainees to solicit relatives and friends to invest with Defendants. Tse also said that foreign currency futures trading was a good investment and encouraged the trainees to invest their own money.

77. As instructed by Defendants, Zhang began soliciting her friends and relatives to invest in foreign currency futures trading. At all times during her solicitation activities, Zhang was unaware of the fraudulent nature of Defendants' business.

78. During and after the training, the individual Defendants encouraged Zhang and other account executives to invest their own money in foreign currency futures trading. In response to these statements, Zhang invested a total of $118,990 of her own money with Defendants for foreign currency trading. This amount represents numerous investments from January 2004 through November 2006.

79. Zhang had no previous experience in investing in foreign currency futures trading and her net worth is less than $5 million.

80. In late February 2007, Zhang began to suspect that Defendants' business was not legitimate after former CIS employees told Zhang about the CFTC Action and Consent Order. Zhang found and read the Consent Order. After reading the Consent Order, she came to believe that Defendants' business was not, in fact, legitimate. At that time in late February 2007, she also told Jimmy Jen, Xue-Huan Gao, Yuan-Chung Zhang, and Carol Jian Deng of her suspicions.

81. She began to demand the return of her investments from Tse. Defendants, however, failed and refuse to return any of the $118,990 Zhang invested with Defendants.

## 2. Allegations Specific to Bay Area Affordable Housing, LLC

82. Bay Area Affordable Housing, LLC ("BAAH") is a business that is involved in real estate development. Jimmy Jen is the Member of BAAH.

83.    Jen and Mei-Fang Lisa Zhang have mutual friends.  In late 2003, Zhang solicited Jen to invest BAAH's money in Defendants' foreign currency futures transactions.

84.    Neither Jen nor BAAH has any previous experience in investing in foreign currency futures trading.  BAAH's net worth is less than $1 million.  Its obligations are not guaranteed or otherwise supported by a letter of credit or keepwell, support, or other agreement under any agreement, contract, or transaction.  Foreign currency futures trading is not BAAH's principal line of business, which is real estate development.  Thus, BAAH's foreign currency futures trading transactions were not in connection with the conduct of BAAH's business.

85.    Jen believed that Defendants' foreign currency futures trading would be a good investment for BAAH.  Accordingly, he invested a total of $93,500 with South China, Pacific Best, and NICI.  This amount represents numerous investments from January 2004 through December 2006.

86.    In late February 2007, Zhang told Jen that she suspected that Defendants' business was not legitimate.  Accordingly, on February 20, 2007, Jen met with Tse and Jennifer Li, who acted as a business manager.  At that meeting, Zhang demanded money back from Tse and Li on behalf of BAAH, Mei-Fang Lisa Zhang, and Yuan-Chung Zhang.  In response, Tse instructed Li to verify the investment amounts of BAAH, Mei-Fang Lisa Zhang, and Yuan-Chung Zhang.  He told Jen that if the investment amounts demanded were accurate, then "headquarters" in Hong Kong would process the account closings and refund their investments.  On February 21, 2007, Li called Mei-Fang Lisa Zhang and verified the investment amounts of BAAH, Mei-Fang Lisa Zhang, and Yuan-Chung Zhang, as stated by Jen, to be accurate.  Nonetheless, Jen never heard back from Tse, Li, or any other Defendant regarding the account closings and refunds.  Despite the demand, Defendants have failed to return BAAH's $93,500 investment.

**3.    Allegations Specific to Xue-Huan Gao**

87.    In August 2006, Xue-Huan Gao responded to an employment advertisement placed by Defendants in the Sing Tao Daily newspaper.  The advertisement was similar to the one Mei-Fang Lisa Zhang saw, as described above in paragraph 75.  That month, Gao was

interviewed for the job by Molly Lau, who offered her the job at the interview. Gao worked for CIS Inc.

88.    After being hired, Gao attended training on placing foreign currency futures trading, similar to the training described above in paragraph 76. Lau and Tse conducted the training session with Gao and others, and they made the same kinds of statements to the trainees as described in paragraph 76.

89.    Gao had no previous experience in investing in foreign currency futures trading and her net worth is less than $5 million.

90.    Gao was unable to solicit any customers to place trades through her. Nonetheless, based on what Defendants told her during her training, she thought that foreign currency futures trading would be a good investment for her. Accordingly, she invested $40,000 of her own money with Defendants starting in October 2006 for foreign currency futures trading. She opened the account with $20,000 in October 2006. Her account statements, however, began to show losses. She added $10,000 to maintain her security deposit in light of the losses shown on the account, and later added an additional $10,000 payment.

91.    In late February 2007, Zhang told Gao that she suspected that Defendants' business was not legitimate. Accordingly, Gao ceased all investment and trading activity with Defendants. Defendants have never returned any of her $40,000 investment.

**4.    Allegations Specific to Yuan-Chung Zhang**

92.    Yuan-Chung Zhang is a niece of Mei-Fang Lisa Zhang. In early 2006, Mei-Fang Lisa Zhang solicited Yuan-Chung Zhang to invest her money.

93.    Yuan-Chung Zhang had no previous experience in investing in foreign currency futures trading and his net worth is less than $5 million.

94.    Based on what Mei-Fang Lisa Zhang told her, Yuan-Chung Zhang believed that Defendants' foreign currency futures trading would be a good investment for her. Accordingly, she invested single payment of $10,000 with Defendants for foreign currency trading in early 2006.

95.    In late February 2007, Zhang told Yuan-Chung Zhang that she suspected that Defendants' business was not legitimate. Defendants have never returned any of Yuan-Chung Zhang's $10,000 investment

### 5.    Allegations Specific to Carol Jian Deng

96.    In August 2006, Carol Jian Deng responded to an employment advertisement placed by Defendants in the Sing Tao Daily newspaper. The advertisement was similar to the one Mei-Fang Lisa Zhang saw, as described above in paragraph 75. That month, Deng was interviewed for the job by Molly Lau, who offered her the job at the interview. Lau told her to return in a week to begin work, and specifically to begin training. Deng worked for CIS Inc.

97.    After being hired, Deng attended training on placing foreign currency futures trading, similar to the training described above in paragraph 76. Lau and Tse conducted the training session with Deng and others, and they made the same kinds of statements to the trainees as described in paragraph 76. Deng told Hao Liang, a friend of hers, what she heard in training and recommended foreign currency futures trading as an investment for him.

98.    Deng had no previous experience in investing in foreign currency futures trading and her net worth is less than $5 million.

99.    Deng began to solicit customers for foreign currency futures trading. Her first customer was Hao Liang. She placed trades on his behalf starting in September 2006. She also obtained one other customer for whom she placed trades.

100.    Based on what Defendants told her during her training, she thought that foreign currency futures trading would be a good investment for her. Accordingly, she invested a total of $21,500 of her own money with Defendants for foreign currency futures trading. The initial investment was $20,000 in December 2006. The second investment was $1,500 to cover trading losses and maintain her security deposit. She also transferred some of her salary due from Defendants to cover losses on Hao Liang's account, as described below in paragraph 105.

101.    By December 2006, account statements of her customers showed such large losses that she ceased all solicitation activities on behalf of Defendants.

102.    In late February 2007, Zhang told Deng that she suspected that Defendants' business was not legitimate.    At that time, Deng told Liang about Zhang's suspicions. Defendants have never returned any of Deng's $21,500 investment.

**6.    Allegations Specific to Hao Liang**

103.    Hao Liang is a friend of Carol Jian Deng.  In August 2006, during Deng's training with Defendants, Deng recommended foreign currency futures trading to Liang.

104.    Liang had no previous experience in investing in foreign currency futures trading and his net worth is less than $5 million.

105.    Based on what Deng told him, Liang believed that Defendants' foreign currency futures trading would be a good investment for him.  Accordingly, he invested a total of $37,159 with Defendants for foreign currency trading.  His initial investment was $20,000, paid via three checks in September 2006.  He paid Defendants an additional $10,000 in December 2006 to maintain his security deposit in light of losses on the account.  He made an additional payment of $5000 in February 2007 to cover losses.  In addition, as a gift to Liang, Deng transferred $825 in February 2007 and $500 and $834 of her own money in the form of salary from Defendants in order to cover Liang's losses.

106.    In late February 2007, Deng told Liang about her conversations with Mei-Fang Lisa Zhang, and Zhang's suspicions that Defendants' business was not legitimate.  Defendants have never returned any of Liang's $37,159 investment.

## VI.    RICO ALLEGATIONS

107.    Each Plaintiff is a "person injured in his business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

108.    At all relevant times hereto, Plaintiffs and Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

109.    The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "Forex Fraud Enterprise":  (1) Wei-Man Raymond Tse, (2) Run Ping Zhou (a.k.a. Flora Zhou), (3) Theresa Wong, (4) James Yu, (5) Bill Shu Wai Ma, (6) Molly Lau, (7) Victor So, (8)

1    Jian Xiao, (9) Christ Investment Service Inc., (10) CIS Service, Inc., (11) Pacific Best Group

2    Ltd. (a.k.a. Pacific Best Company Ltd.), (12) South China Investment Inc., (13) National

3    Investment Consultants, Inc., (14) Christ Investment FCM Service, Inc. (a California

4    corporation), (15) CIS International LLC (a Nevada limited liability company), and (16) Christ

5    Investment Service, LLC.

6        110.    The individual Defendants and those who work for the business entity Defendants

7    conduct and manage the activities of the Forex Fraud Enterprise.

8        111.    The purpose of the Forex Fraud Enterprise and all its members is to defraud and

9    steal money from investors by accepting investments for foreign currency futures trading and

10    misappropriating the amounts invested. All of the above individuals and business entities

11    operate as a single continuing unit under the direction of Wei-Man Raymond Tse.

12        112.    The Forex Fraud Enterprise is an ongoing enterprise, which engages in, and

13    whose activities affect, interstate and international commerce. The Forex Fraud Enterprise began

14    at least by November 2000 and presently continues to operate as a single continuing unit under

15    Tse's control.

16        113.    Although the Defendants participate in the Forex Fraud Enterprise and are a part

17    of it, Defendants also have an existence separate and distinct from the Forex Fraud Enterprise.

18        114.    Defendants' participation in the Forex Fraud Enterprise is necessary for the

19    successful operation of Defendants' scheme.

20        115.    Defendants conduct or participate in the conduct of the Forex Fraud Enterprise's

21    affairs through a pattern of racketeering activity.

22        116.    The Forex Fraud Enterprise has an ascertainable structure separate and apart from

23    the pattern of racketeering activity in which the Defendants have engaged and are engaging. The

24    Forex Fraud Enterprise is a structure headed by Tse. The remaining individual Defendants take

25    their orders from Tse. Tse controls the corporate Defendants and their agents and employees,

26    and causes the business entity Defendants to carry out his orders. He also controls the non-

27    Defendant business entities that comprise the Forex Fraud Enterprise and the agents and

28    employees of these entities.

**A.    Predicate Acts**

117.    The numerous predicate acts of mail and wire fraud, bank fraud, and interstate transportation of stolen property described herein are part of the fraudulent scheme by Defendants to steal money from Plaintiffs and other investors.

118.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of Title 18, United States Code, Section 1343 (wire fraud) and Section 1344 (a scheme or artifice to defraud a financial institution).

119.    In carrying out the overt acts and fraudulent schemes described above, the Defendants engaged in, among other things, conduct in violation of federal laws, including 18 U.S.C. §§ 1343, 1344, and 1346.

120.    Examples of the predicate acts committed by Defendants pursuant to their scheme to steal money from Plaintiffs and other investors include those set forth above in paragraphs 70-71. Upon information and belief, there have been numerous other predicate acts by Defendants that are presently unknown to Plaintiffs.

**B.    Wire and Bank Fraud**

121.    For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of misrepresentations, misleading statements, and/or omissions, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom, including communications.

122.    For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs and other investors, Defendants caused their account executives to use the telephone to place phony foreign currency future trades in violation of 18 U.S.C. § 1343, including but not limited to those acts set forth above in paragraph 70(a).

123.    In those matters and things sent or delivered by wire and/or through other interstate and international electronic media, Defendants made misrepresentations, misleading statements, and/or omissions to Plaintiffs, in violation of 18 U.S.C. § 1343, including but not limited to those acts set forth above in paragraph 70(b). Plaintiffs reasonably relied on Defendants' false statements of purported daily trading activity and account balances by

1    continuing to invest money with Defendants and not taking immediate action to close their

2    accounts and demanding the return of their investments.

3        124.    For the purpose of executing and/or attempting to execute their scheme to defraud

4    Plaintiffs and other investors, Defendant Molly Lau used the telephone to lure Carol Jian Deng

5    and Xue-Huan Gao into becoming account executives of CIS Inc., in violation of 18 U.S.C.

6    § 1343. Deng and Gao reasonably relied on Lau's representations that the jobs offered were real

7    and that CIS Inc. was a legitimate business.

8        125.    For the purpose of executing and/or attempting to execute their scheme to defraud

9    Plaintiffs and other investors, Defendants fraudulently obtained funds under the custody or

10   control of a bank, in violation of 18 U.S.C. § 1344, including but not limited to those acts set

11   forth above in paragraph 71.

12       126.    As a result, Plaintiffs have been injured in their business or property by the

13   Defendants' overt acts and racketeering activities.

14   **C.    Pattern of Racketeering Activity**

15       127.    As set forth herein, the Defendants have engaged in a "pattern of racketeering

16   activity," as defined in 18 U.S.C. § 1961(5), by committing and/or conspiring to commit at least

17   two such acts of racketeering activity, as described herein, within the past 10 years. Defendants

18   have committed multiple acts of racketeering activity within such period. Each such act of

19   racketeering activity was related, had similar purposes, involved the same or similar participants

20   and methods of commission, and had similar results impacting upon similar investor victims,

21   including Plaintiffs.

22       128.    The multiple acts of racketeering activity committed and/or conspired to be

23   committed by Defendants, as described above, were related to each other and amount to, and

24   pose a threat of, continued racketeering activity and therefore constitute a "pattern of

25   racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

26

27

28

## COUNT I

### RICO: 18 U.S.C. § 1962(c)

129.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.    Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt."

131.    Through the patterns of racketeering activities described above, Defendants have conducted and participated in the affairs of the Forex Fraud Enterprise.

132.    As a direct and proximate result of Defendants' illegal conduct in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, including, but not limited, by:

  a.    The theft and loss of the amounts Plaintiffs invested with Defendants in an amount that will be proven at trial, but in excess of $321,149.

  b.    The consequential damages relating to not receiving the investment return that Plaintiffs could have obtained from prudent investments.

## COUNT II

### RICO CONSPIRACY: 18 U.S.C. § 1962(d)

133.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

134.    Plaintiffs seek relief for the Defendants' activities described herein for violations of 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

135.    Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

136.    But for Defendants' conspiracy and joint efforts, the Forex Fraud Enterprise would not be successful.

137.   Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to steal money from investors such as Plaintiffs, and to conduct and/or participate in, directly or indirectly, the conduct of the affairs of the Forex Fraud Enterprise described above through a pattern of racketeering activity.

138.   The named Defendants herein and their agents have been joined in their conspiracy to violate 18 U.S.C. § 1962(c) by various members of the Forex Fraud Enterprise and third parties not named as defendants herein.

139.   Defendants agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), and agreed to commit overt acts and predicate acts, as alleged in this Complaint, to effectuate that conspiracy.  Defendants were aware that their acts were part of an overall pattern of racketeering activity.

140.   As a direct and proximate result of the Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have been and are continuing to be injured in their business or property as described above in paragraph 132, in an amount that will be proven at trial, but in excess of $321,149.

## COUNT III

## COMMODITIES FRAUD: 7 U.S.C. § 6b(a)

141.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 140 as if fully set forth herein.

142.   Under 7 U.S.C. § 25(a)(1), any person who violates the Commodity Exchange Act, or who willfully aids, abets, counsels, induces, or procures the commission of a violation of the CEA shall be liable for actual damages from one or more commodities transactions, and caused by such violation to any other person who made such transactions.  Such transactions include those consisting of any contracts of sale of any commodity for future delivery or deposit or payment of money in connection with any order to make such a contract.

143.   Defendants' purported placement of foreign currency futures trades constitutes the making of a contract of sale of a commodity for future delivery made, or to be made, for or on behalf of investors.  Such contracts for future delivery are or may be used for delivering a

1  commodity, namely foreign currency, sold in interstate and/or foreign commerce for the
2  fulfillment thereof.

3      144.    By their conduct described above, Defendants have violated the CEA and/or
4  willfully aided, abetted, counseled, induced, or procured the commission of a violation of the
5  CEA.

6      145.    By the conduct described above, Defendants cheated or defrauded Plaintiffs, and
7  attempted to cheat or defraud plaintiffs in violation of 7 U.S.C. § 6b(a)(i).    In specific,
8  Defendants made the misrepresentations and omissions described above in paragraphs 48 and 67.

9      146.    Moreover, Defendants willfully made or caused to be made to Plaintiffs false
10  reports or statements of such foreign currency futures trading activity. Defendants sent Plaintiffs
11  false statements of alleged foreign currency transactions, alleged profits and losses, and
12  purported account balances.  By sending these statements, Defendants entered or caused to be
13  entered, on investors' behalf, a false record of foreign currency contracts. These false statements
14  and records violated 7 U.S.C. § 6b(a)(ii).

15      147.    By making the misrepresentations and omissions described above in paragraphs
16  48 and 67 above, Defendants willfully deceived or attempted to deceive Plaintiffs in regard to
17  foreign currency futures contracts and the disposition or execution of such contracts, in violation
18  of 7 U.S.C. § 6b(a)(iii).

19      148.    Plaintiffs reasonably relied on these misrepresentations and omissions, and the
20  false statements sent by Defendants to Plaintiffs.

21      149.    As a direct and proximate result of Defendants' conduct as described herein,
22  Plaintiffs have suffered damages in an amount that will be proven at trial, but in excess of
23  $321,149.

24                          **COUNT IV**

25                      **COMMODITIES FRAUD**

26    **ILLEGAL OFF-EXCHANGE FUTURES CONTRACTS:  7 U.S.C. § 6(a)**

27      150.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through
28  149 as if fully set forth herein.

1    151.    Defendants offered to Plaintiffs and other investors to enter into, entered into,

2    executed, confirmed the execution of, and/or conducted an office in the United States for the

3    purpose of soliciting and accepting orders, and/or otherwise dealt in transactions in contracts for

4    the purchase or sale of a commodity for future delivery, namely foreign currency futures

5    contracts.

6    152.    Defendants engaged in transactions that were not conducted on or subject to the

7    rules of a board of trade which has been designated or registered by the CFTC as a contract

8    market or derivatives transaction execution facility for such commodity.

9    153.    Defendants did not cause Plaintiffs' or any other investors' contracts to be

10   executed or consummated by or through a contract market.

11   154.    The contracts entered into on behalf of Plaintiffs and other investors by

12   Defendants were not evidenced by a record in writing which shows the date, the parties to such

13   contract and their addresses, the property covered and its price, and the terms of delivery.

14   155.    By the conduct described herein, the Defendants violated 7 U.S.C. § 6(a).

15   156.    In addition, the Defendants accepted Plaintiffs' and other investors' money in

16   soliciting orders or accepting orders for the purchase or sale of a commodity for future delivery,

17   namely foreign currency futures transactions.    Under the CEA, an entity must be a futures

18   commission merchant in order to accept investors' money.

19   157.    None of the Defendants are futures commission merchants registered with the

20   CFTC.  Therefore, by accepting money in connection with such orders, Defendants have violated

21   7 U.S.C. § 6d(a).

22   158.    Plaintiffs invested their money in these illegal off-exchange futures contracts with

23   Defendants, and Defendants have failed and refuse to return Plaintiffs' investments.

24   159.    Thus, as a direct and proximate result of Defendants' conduct as described herein,

25   Plaintiffs have suffered damages in an amount that will be proven at trial, but in excess of

26   $321,149.

27

28

## COUNT V

## COMMODITIES FRAUD

### FICTITIOUS SALES:  7 U.S.C. § 6c(a)

160.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 159 as if fully set forth herein.

161.    Defendants offered to enter into, entered into, and confirmed the execution of fictitious sales of foreign currency futures, where the transactions purportedly are used or may be used to delivery a commodity sold, shipped, or received in interstate commerce for the execution of the transaction.

162.    In specific, the foreign currency futures transactions Defendants entered into Plaintiff were wholly fictional.  Defendants never engaged in any trading activity with Plaintiffs' funds.  Accordingly, Defendants' conduct violated 7 U.S.C. § 6c(a).

163.    Plaintiffs invested their money with Defendants in what turn out to be fictional sales, and Defendants have failed and refuse to return Plaintiffs' investments.

164.    Thus, as a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have suffered damages in an amount that will be proven at trial, but in excess of $321,149.

## COUNT VI

## COMMODITIES FRAUD

### CONVERSION:  7 U.S.C. §§ 6d(a)(2), 13(a)(1)

165.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 164 as if fully set forth herein.

166.    Under 7 U.S.C. § 6d(a)(2), a person acting as a futures commission merchant must treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer as belonging to the customer.

167.    By accepting money from Plaintiffs and other customers, Defendants were acting as futures commission merchants, and were required to be registered with the CFTC.  They were

1  therefore required by 7 U.S.C. § 6d(a)(2) to treat customers' investments as belonging to such

2  customers.

3      168.    Moreover, it is a felony under 7 U.S.C. § 13(a)(1) for any person required to be

4  registered with the CFTC, or any employee or agent thereof, to embezzle, steal, purloin, or with

5  criminal intent convert to such person's use or to the use of another, any money, securities, or

6  property having a value in excess of $100, which was received by such person or any employee

7  or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or

8  accruing to such customer as a result of such trades or contracts or which otherwise was received

9  from any customer.

10     169.    Defendants accepted Plaintiffs' and other customers' money to guarantee trades,

11 and failed to segregate and safeguard their money.  To the contrary, Defendants stole money in

12 excess of $100 that Plaintiffs and other customers deposited with Defendants to guarantee their

13 trades.  Accordingly, Defendants violated 7 U.S.C. § 6d(a)(2) and 7 U.S.C. § 13(a)(1).

14     170.    Thus, as a direct and proximate result of Defendants' conduct as described herein,

15 Plaintiffs have suffered damages in an amount that will be proven at trial, but in excess of

16 $321,149.

17                              **COUNT VII**

18                               **FRAUD**

19     171.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

20 170 as if fully set forth herein.

21     172.    Defendants made repeated false representations to, and concealed material

22 information from, Plaintiffs, as described above in paragraphs 48 and 67.

23     173.    Defendants knew that these representations were false at the time the

24 representations were made, or Defendants recklessly disregarded the truth or falsity of the

25 statements.  Defendants further knew that they were withholding material facts from Plaintiffs

26 regarding their accounts.  Defendants made these representations, and withheld material facts, so

27 that Plaintiffs would invest, continue to invest, and continue to keep their funds invested with

28

1   Defendants, permitting them to continue their trading activity, and otherwise to defraud Plaintiffs

2   as set out herein.

3       174.   Plaintiffs did not know the representations were false when they were made, and

4   did not know of the material information concealed from them regarding their accounts, and

5   justifiably and reasonably relied upon these representations by, among other things, transferring

6   funds to Defendants.

7       175.   Plaintiffs were not aware that Defendants' representations were false when they

8   were made to Plaintiffs, nor were Plaintiffs aware that material information concerning their

9   accounts, were being concealed from them.  Had Plaintiffs been aware of the true facts, Plaintiffs

10   would not have transferred funds to Defendants and would have closed their existing accounts

11   with Defendants.

12       176.   As a direct and proximate result of Defendants' misrepresentations, failures to

13   disclose, and concealment of facts, Plaintiffs have suffered damages in an amount which will be

14   proven at trial, but in excess of $321,149.

15       177.   In doing the above acts, Defendants, and each of them, acted with malice, fraud,

16   oppression, or in conscious disregard of the rights of Plaintiffs, thereby entitling Plaintiffs to an

17   award of exemplary and punitive damages. through

18   **COUNT VIII**

19   **COMMON LAW CONVERSION**

20       178.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

21   177 as if fully set forth herein.

22       179.   Plaintiffs owned certain money which they delivered to Defendants as deposits to

23   being trading foreign currency futures.  The total amount deposited by Plaintiffs with Defendants

24   was $321,149.

25       180.   Plaintiffs owned the amounts on account with Defendants for foreign currency

26   futures trading, as well as the proceeds of any trades or sales made by Defendants.

27       181.   Defendants wrongfully disposed of Plaintiffs' property by stealing and

28   misappropriating funds from Plaintiffs' accounts.

182.  As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs have suffered damages in an amount to be proven at trial, but in excess of $321,149.

## COUNT IX

## BREACH OF FIDUCIARY DUTY

183.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 182 as if fully set forth herein.

184.  Based on the relationship between Plaintiffs, on one hand, and Defendants on the other hand, as described above, each Defendant owed each Plaintiff the duties of a fiduciary, including, but not limited to, the following:

     a.  The duty to deal fairly and honestly with Plaintiffs, to act with the highest good faith towards Plaintiffs and to put Plaintiffs' interests over their own;

     b.  The duty to manage Plaintiffs' accounts in the best interest of Plaintiffs;

     c.  To only purchase foreign currencies futures, and otherwise use Plaintiffs' funds, as authorized by Plaintiffs; and

     d.  To inform Plaintiffs of all material facts regarding the uses to which Defendants put Plaintiffs' funds.

185.  Defendants breached their fiduciary duty to Plaintiffs by, among other things:

     a.  Failing to deal fairly and honestly with Plaintiffs, not acting in good faith towards Plaintiffs, and failing to put Plaintiffs' interests over their own;

     b.  Failing to manage Plaintiffs' accounts in the best interest of Plaintiffs;

     c.  Stealing Plaintiffs' funds and otherwise using Plaintiffs' funds in a manner not authorized by Plaintiffs; and

     d.  Failing to inform Plaintiffs of all material facts regarding the uses to which Defendants put Plaintiffs' funds.

     e.  Making the misrepresentations and omissions to Plaintiffs as described above in paragraphs 48 and 67.

186.  As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiffs, Plaintiffs have suffered damages in an amount to be proven at trial, but in excess of

1  $321,149. Because of Defendants' callousness toward their customers, and wanton disregard for

2  Plaintiffs' rights and welfare, and in that Defendants' actions rose to the level of fraud, Plaintiffs

3  request an award of exemplary and punitive damages against each Defendant.

## COUNT X

### BREACH OF ORAL CONTRACT

6      187.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

7  186 as if fully set forth herein.

8      188.    As set out above, Plaintiffs orally agreed with Defendants to invest their funds

9  with Defendants to be used for the purchase of trading foreign currency futures. In exchange,

10  Defendants agreed to conduct such foreign currency futures transactions.

11      189.    Plaintiffs have performed all conditions, covenants and promises required by

12  them on their part to be performed in accordance with the terms and conditions of these

13  agreements.

14      190.    Defendants breached these agreements by, among other things, not conducting

15  actual currency trades with Plaintiffs' funds, misappropriating Plaintiffs' funds, and otherwise

16  using Plaintiffs' funds in contravention of Plaintiffs' instructions.

17      191.    As a result of Defendants' breaches of these oral agreements, Plaintiffs have

18  suffered damages in an amount to be proven at trial, but in excess of $321,149.

## COUNT XI

### NEGLIGENCE

21      192.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

22  191 as if fully set forth herein.

23      193.    Defendants owed Plaintiffs a duty to take reasonable care in the handling of their

24  funds to prevent unauthorized use of such funds. Defendants further owed Plaintiffs a duty to

25  invest their funds properly in accordance with Plaintiffs' instructions to purchase foreign

26  currency futures.

27

28

194.    Defendants breached their duty of care toward Plaintiffs by permitting Defendants' personnel to misappropriate Plaintiffs' funds, and by failing to carry out Plaintiffs' instructions to purchase foreign currencies.

195.    As a result of each Defendant's negligent conduct, Plaintiffs have sustained damages, in an amount to be proven at trial, but in excess of $321,149.

196.    It was foreseeable that Plaintiffs would suffer the type of damages they have suffered as a result of the failure of each Defendant to act as a reasonably prudent commodities trade with respect to Plaintiffs' funds, and each Defendant's acts and omissions were the legal and proximate cause of Plaintiffs' damages.

## COUNT XII

## UNFAIR COMPETITION

## VIOLATION OF CAL. BUSINESS & PROFESSIONS CODE

## SECTION 17200 et seq.

197.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 196 as if fully set forth herein.

198.    The acts of Defendants alleged in paragraphs 1 through 196 above were unlawful, unfair, and/or fraudulent business acts or practices as defined in California Business & Professions Code Section 17200 et seq.  Among other things, they have violated the CEA and California Corporations Code Sections 29520 and 29536.

199.    As a direct, proximate, and foreseeable result of Defendants' conduct, Plaintiffs have been harmed as set forth herein.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.)    On Counts I and II, granting compensatory damages in an amount to be proven at trial, but in excess of $321,149 and trebling of such damages pursuant to 18 U.S.C. § 1964, along with the costs of suit herein incurred and attorneys' fees;

2.)    On Count III through VI, granting compensatory damages in an amount to be proven at trial, but in excess of $321,149.

3.)    On Counts VII through XI:

1    a.  granting damages in an amount to be proven at trial, but in excess of

2 $321,149;

3    b.  For interest on Plaintiffs' capital from the dates of their transfer to

4 Defendants;

5    c.  For exemplary and punitive damages according to proof at the time of

6 trial.

7  4.)  On Count XII:

8    a.  for any order or judgment as may be necessary to prevent the use of the

9 practices alleged herein that constitute unfair competition;

10    b.  for any order or judgment as may be necessary to restore to Plaintiffs any

11 money or property that might have been acquired by means of such unfair competition in

12 an amount to be proven at trial, but in excess of $321,149;

13    c.  for attorneys' fees as provided by California Business & Professions Code

14 section 17200 et seq.

15  5.)  On all Counts:  permanent injunctive relief prohibiting Defendants, and any other

16 person or entity associated with them, including any successor thereof, from engaging in the

17 conduct complained of herein, including but not limited to violations of the CEA and California

18 Corporations Code Sections 29520 and 29536.

19  6.)  On all Counts: for costs of suit herein incurred.

20  7.)  On all Counts: for such other and further relief as the Court may deem just and

21 proper.

22

23          Respectfully Submitted,

24          COOKE, KOBRICK, & WU LLP

25 Dated: September 24, 2007

26          By: _____

27           STEPHEN S. WU

           Attorneys for Plaintiffs

28

REQUEST FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all claims so properly tried.

COOKE, KOBRICK, & WU LLP

Dated:  September 24, 2007

By:  _Stephen S. Wu_

STEPHEN S. WU
Attorneys for Plaintiffs

- 36 -
COMPLAINT